## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | No. 3:17-cr-238 (VAB) |
| ALBERT LOPEZ,<br>*Defendant*. | |

## RULING ON MOTION TO SUPPRESS

On February 6, 2018, Albert Lopez ("Defendant") moved to suppress evidence of a firearm seized by officers with a joint task force of the U.S. Marshals Service and the Bridgeport Police Department on October 12, 2017, during a search of the bedroom he slept in while staying at his mother's house. Motion to Suppress, dated Feb. 6, 2018 ("Suppression Mot."), ECF No. 15; Memorandum in Support of Suppression Mot., dated Feb. 6, 2018 ("Def.'s Mem."), annexed to Suppression Mot., ECF No. 15-1. Mr. Lopez challenges both the lawfulness of searching his bedroom without his consent, as well as the officers' claims that his mother's consent was sufficient to authorize the search.

On February 20, 2018, the United States of America (the "Government") opposed Mr. Lopez's suppression motion. Government's Opposition to Suppression Mot., dated Feb. 20, 2018 ("Gov't Opp."), ECF No. 18.

On April 9, 2018, the Court conducted an evidentiary hearing on the motion, which was continued to June 26, 2018. Minute Entries, dated Apr. 9, 2018 & Jun. 26, 2018, ECF Nos. 25 & 35; Transcript of Suppression Hearing, filed Jun. 4, 2018 (Vol. I) & Jul. 23, 2018 (Vol. II) (collectively, "Tr."), ECF Nos. 30 & 43.

After the evidentiary hearing concluded, the parties submitted post-hearing briefs. Defendant's Post-Hearing Memorandum of Law, dated Aug. 3, 2018 ("Def.'s Post-Hrg. Mem."), ECF No. 44; Government's Memorandum in Opposition to Def.'s Post-Hrg. Mem., dated Aug. 24, 2018 ("Gov't Post-Hrg. Mem."), ECF No. 45.

For the following reasons, Defendant's motion to suppress is **DENIED**.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Findings of Fact[1]

On August 3, 2011, a grand jury returned a one-count indictment charging Mr. Lopez with possession of a firearm by a convicted felon.[2] Indictment, dated Aug. 3, 2011, No. 3:11-cr-139 (SRU), ECF No.

On August 11, 2011, Mr. Lopez was arraigned before United States Magistrate Judge Holly B. Fitzsimmons and entered a plea of not guilty.[3] Minute Entry, dated Aug. 11, 2011, No. 3:11-cr-139 (SRU), ECF No. 4.

On September 4, 2012, Mr. Lopez, under the terms of a plea agreement signed that same day, pleaded guilty to count one of the indictment before United States District Judge Warren W. Eginton.[4] Minute Entry, dated Sept. 4, 2012, No. 3:11-cr-139 (SRU), ECF No. 33; Plea Agreement, dated Sept. 4, 2012, No. 3:11-cr-139 (SRU), ECF No. 34.

---

[1] The Court makes the following findings, unless expressly stated otherwise.

[2] While the indictment is not part of the suppression hearing record, it is incorporated by reference through the judgment in the criminal case, which was admitted into evidence. *See* Judgment, dated Jan. 4, 2013 ("Gov't Ex. 1"), at 1 ("THE DEFENDANT: pled guilty to count one of the Indictment.").

[3] The Court takes judicial notice of this fact.

[4] While the plea agreement is not part of the suppression hearing record, the fact of Mr. Lopez's guilty plea is stated in the judgment in the criminal case, which was admitted into evidence. *See* Gov't Ex. 1 at 1 ("THE DEFENDANT: pled guilty to count one of the Indictment."). The Court accordingly finds these facts incorporated by reference.

On January 4, 2013, United States District Judge Stefan R. Underhill sentenced Mr. Lopez to a term of imprisonment of sixty months, to run consecutively to a sentence imposed for a supervised release violation in Criminal Case No. 3:07-cr-60, to be followed by thirty-six months of supervised release. Gov't Ex. 1 at 1. Judge Underhill also imposed the following Special Conditions of supervised release:

> 1. The defendant shall participate in a program approved by the Probation office for inpatient or outpatient substance abuse treatment and testing. The defendant shall pay all or a portion of the costs associated with treatment based on the defendant's ability to pay as determined by the probation officer.

> 2. The defendant shall submit his person, residence, office or vehicle to a search conducted by a United States Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release; failure to submit to a search may be grounds for revocation; the defendant shall warn any other residents that the premises may be subject to searches pursuant to this condition.

> 3. The defendant shall not possess a firearm, destructive device or other dangerous weapon.

*Id.* Judge Underhill also imposed the following Standard Condition of supervised release:

> 6. The defendant shall notify the probation officer at least ten days prior to any change in residence or employment, or if such prior notification is not possible, then within five days after such change[.]

*Id.* at 3.

On February 24, 2017, the Bureau of Prisons released Mr. Lopez from its custody and Mr. Lopez began serving his term of supervised release. Petition for Warrant or Summons for Offender Under Supervision, dated Sept. 22, 2017 ("Pet. for Fed. Warrant"), annexed to U.S. District Court for the District of Connecticut Arrest Warrant, dated Sept. 22, 2017 ("Fed. Warrant"), admitted as Gov't Ex. 2, at "Date Supervision Commenced."

On February 27, 2017, Mr. Lopez met with United States Probation Officer Keith Barry. Tr. 11:3–14. Mr. Barry testified that he reviewed the conditions of supervised release with Mr. Lopez, and that Mr. Lopez signed a document acknowledging that he had read and understood the conditions. *Id.*

At some time after that meeting, Mr. Lopez reported to Mr. Barry that he would be residing at 702 Maplewood Avenue, Bridgeport, Connecticut. Tr. 11:15–22. Mr. Barry testified that he visited Mr. Lopez several times at that residence. Tr. 11:23–25. Mr. Barry also testified that Mr. Lopez did not ever discuss changing that residence with him, and that he did not ever visit him at any other residence in the following months of Mr. Lopez's supervised release. Tr. 12:8–14.

On September 22, 2017, Mr. Barry sought and obtained an arrest warrant for Mr. Lopez because Mr. Lopez had violated three conditions of his supervised release. Pet. for Warrant. Mr. Barry testified to having received information from a detective with the Bridgeport Police Department. Tr. 15:13–16:10. Mr. Barry alleged that Mr. Lopez violated the special condition that he "shall not possess a firearm, destructive device or other dangerous weapon":

> A Bridgeport, Connecticut Police incident report states that on September 9, 2017, the Bridgeport, Connecticut Police Department responded to a gun shot victim at St. Vincent's Hospital. The victim informed law enforcement officials that Albert Lopez a former employee had called the victim demanding $4,000 as a loan. On the day of the incident Mr. Lopez showed up at the victim's home demanding $4,000 dollars. When the victim wanted to give the defendant $1,000 of the $4,000 Mr. Lopez reportedly refused the money, pulled out a silver colored firearm from his waistband, fired a shot at him hitting him in the leg telling him to keep the $1,000, he would need it for the hospital bill. Mr. Lopez then fled the scene.

Pet. for Fed. Warrant at 1, "Charge #1." Mr. Barry also alleged that Mr. Lopez: (1) unlawfully possessed controlled substances, in violation of mandatory condition two, by testing positive for

both marijuana and cocaine; and (2) failed to participate in a substance abuse treatment program, in violation of special condition one, insofar as he was discharged by Connecticut Renaissance in Bridgeport, Connecticut for lack of participation on September 21, 2017. *Id.* at 1–2, "Charge #2" & "Charge #3."

On September 22, 2017, the Court ordered that an arrest warrant be issued for Mr. Lopez. *See* Pet. for Warrant at 2. That same day, the Clerk of the Court issued an arrest warrant directing "[a]ny authorized law enforcement officer" to arrest and bring Mr. Lopez before United States magistrate judge "without necessary delay," based on the offense described in the petition. Fed. Warrant at 1.

Shortly thereafter, Deputy United States Marshal Adam Mackey, who was leading a joint task force of state, local, and federal law enforcement officers charged with apprehending fugitives with active warrants, received a copy of the federal warrant. Tr. 28:10–29:11; 30:9–20. Deputy Marshal Mackey also received a copy of a warrant sought by the Bridgeport Police Department and Senior Assistant State's Attorney Howard S. Stein on September 20, 2017, and signed by Connecticut Superior Court Judge Robert Devlin on September 22, 2017. Tr. 30:24–32:12; Superior Court Arrest Warrant, dated Sept. 22, 2017 ("State Warrant"), admitted as Gov't Ex. 3, at BPD_000007, BPD_000009.

The state warrant sought Mr. Lopez's arrest on charges of: (1) assault in the first degree, in violation of CONN. GEN. STAT. § 53a-59; (2) carrying a pistol without a permit, in violation of CONN. GEN. STAT. § 29-35(b); and (3) unlawful discharge of a firearm, in violation of CONN. GEN. STAT. § 53-203. State Warrant at BPD_000007. In the application for the warrant, Detective Barbara A. Gonzalez of the Bridgeport Police Department attested to the facts of her investigation between September 9, 2017 (the date the alleged victim, Juan Moreno, was

allegedly shot by Mr. Lopez) and September 15, 2017 (the date Ms. Gonzalez allegedly spoke with Mr. Barry to discuss the incident). *See* Application for Arrest Warrant, annexed to State Warrant, at BPD_000010–13.

After reviewing both warrants, reviewing Mr. Lopez's rap sheet, and conducting further investigation, Deputy Marshal Mackey determined that it was important to be "extra cautious" in attempting to arrest Mr. Lopez in light of his criminal history of unlawful firearm possession. Tr. 33:10–36:5.

Deputy Marshal Mackey testified that he then attempted to determine where Mr. Lopez was staying. Through examining the state court warrant and several posts made by Mr. Lopez on social media, Deputy Marshal Mackey determined that Mr. Lopez was staying at the home of his mother, Lucila Olmo, located at 174 East Avenue, Bridgeport, Connecticut. Tr. 36:6–22, 38:7–40:13; Photographs, admitted as Gov't Exs. 5 & 6. Deputy Marshal Mackey also determined, based on a video display depicted in the lower left-hand corner of one of the photographs, that the residence had a video surveillance system installed. Tr. 40:14–41:9; *see* Gov't Ex. 6.

On October 12, 2017, at approximately 5:30 a.m., Deputy Marshal Mackey and about nine other law enforcement officers met at the Bridgeport Police Department to review the warrants they planned to execute that day, beginning with the warrant for Mr. Lopez. Tr. 41:10–25; 52:6–8.

Shortly after 5:40 a.m., the officers arrived at 174 East Avenue.[5] Tr. 43:16–18; Surveillance Video Footage, dated Oct. 12, 2017, admitted as Def.'s Ex. E (hereafter, "Vid.").[6] After they had formed a perimeter around the property, Deputy Marshal Mackey stepped onto the porch. Tr. 48:23–49:3; Vid. 5:42:17–19. He quickly turned two surveillance cameras to the side, Vid. 5:42:19–34, testifying that he did so to prevent Mr. Lopez from having a visual of the front porch. *See* Tr. 228:4–20; 49:4–22. He did not see a third camera, however, which recorded the events on the porch from the right-hand side of the porch.

Deputy Marshal Mackey was joined on the porch by two other officers, Task Force Officers King and Cortina, who were both employed by the Bridgeport Police Department. Tr. 235:16–237:19; Vid. 5:42:27–40. Deputy Marshal Mackey, who is over six feet tall,[7] looked through a window at the top of the door before he began knocking, and continued to look

---

[5] At this point, the timing recalled by Deputy Marshal Mackey and the other officers slightly diverges from timestamps indicated in a video taken by one of Ms. Olmo's security cameras, which was admitted as Defendant's Exhibit E. While Mr. Lopez's counsel suggests this divergence is significant, the Court agrees with the Government that it is largely irrelevant what precise times the events in question occurred at—particularly given that there is no evidence that the timestamps recorded by the video are more accurate than those recalled by Deputy Marshal Mackey and his fellow officers. *See* Gov't Post-Hrg. Mem. at 5 n.1.

      What is relevant is the order in which the events in question occurred. In describing the events that follow, the Court makes findings with respect to the sequence of events, without having to resolve when they occurred precisely.

[6] This exhibit was only admitted after being properly authenticated by Mr. Lopez's brother Brian Lopez, who testified that he downloaded the footage from the surveillance system on November 11, 2017. Tr. 219:11–220:12. The surveillance footage is comprised of twenty-five individual video files, taken from three different cameras. Two of the cameras, as explained below, were turned aside and did not provide any view of the events that followed. Footage from the unobstructed camera, "Channel 2," appears on sixteen individual files which generally form a continuous video sequence; there do, however, appear to be a few gaps in the footage. For the purposes of this opinion, the Court will cite all of the files from Channel 2 collectively (as "Vid."), with reference to specific timestamps in the footage as necessary. As noted above, these citations should not be construed as a specific factual finding that these timestamps accurately reflect the precise time that the events depicted occurred.

[7] At the first part of the suppression hearing, Deputy Marshal Mackey first stated that he was six feet, five inches tall. Tr. 50:6–7. At the continuation of the hearing, Deputy Marshal Mackey testified that he was "roughly 6'3." Tr. 225:13–14. Mr. Lopez makes much of this discrepancy. Def.'s Reply Mem. at 5 n.4 ("DUSM Mackey's testimony also had incredible statements, including that even his height changed, going from "about 6'5" while testifying on direct examination, Tr. at 50, but "roughly 6'3" during cross-examination, Tr. at 225, and instances where he could not recall facts from the events, as detailed in the prior memo."). In any event, the Court need not make a finding as to his precise height, as the parties do not dispute that Deputy Marshal Mackey is tall.

through that window while knocking. Tr. 50:6–15; Vid. 5:42:40–43. Deputy Marshal Mackey began knocking on the door, announcing himself and his team as police there to execute an arrest warrant for Mr. Lopez.[8] Tr. 49:24-50:5; Vid. 5:42:47. At this point a fourth officer, Task Force Officer ("TFO") Edgar Nunez, stepped onto the porch as well. Vid. 5:42:43–47.

While knocking over the next minute or so, Deputy Marshal Mackey used his flashlight several times to illuminate the hallway behind the door. Vid. 5:42:57–5:43:21; Tr. 50:8–15. Deputy Marshal Mackey testified that he soon saw Mr. Lopez walk into the hallway and then walk out of his sight. Tr. 50:16–20. It was this, Deputy Marshal Mackey said, that prompted him to start banging and kicking on the door, as he feared Mr. Lopez might attempt to "get something" or "hide something."[9] Tr. 50:16–23, 51:4–12; Vid. 5:44:00–5:44:10. After several swift kicks, Deputy Marshal Mackey moved to look through the top window of the door, illuminating it with his flashlight. Vid. 5:44:11–14; Tr. 241:6–14. A light then appears to go on behind the door, illuminating the window brightly. Vid. 5:44:15–5:44:20; Tr. 241:15–242:12.

At this point, a man—whom Deputy Marshal Mackey later identified as Ms. Olmo's friend, Mr. Soto—approached the door. Deputy Marshal Mackey alternates between attempting to turn the doorknob, pushing the door with his hands, and looking through the top window. Tr. 242:13–18; Vid. 5:44:20–40. Deputy Marshal Mackey testified that he could visually see the man attempt to open the door, but struggle "due to the kicking of the door." Tr. 50:23–51:2.

---

[8] While the video depicts Deputy Marshal Mackey knocking, the footage did not record any audio. Accordingly, the Court's findings, as to any words exchanged on the porch, are based on the officers' testimony.

[9] At this point there is a gap in the video footage of approximately forty seconds. When the footage resumes at 5:44:00, Deputy Marshal Mackey can be seen, mid-kick, kicking the door with his left foot.

Moments later, the front door was opened.[10] Vid. 5:44:42. Deputy Marshal Mackey entered, followed by TFOs Cortina, King, and Nunez. At the same time, TFO Martin stepped onto the porch. Vid. 5:44:47–50. Shortly thereafter, another uniformed officer joins him. Vid. 5:44:53–59.

Deputy Marshal Mackey testified that when he entered, Mr. Lopez was standing toward the back of the hallway. Deputy Marshal Mackey and the other officers "bypassed" Mr. Soto (who had opened the door) and handcuffed Mr. Lopez where he was standing, in the hallway. Tr. 51:21–52:5,

Several of the other task force officers performed a protective sweep, which revealed that Mr. Lopez, Ms. Olmo, and Mr. Soto were the only people in the home. Tr. 53:10–23; 97:10–14. Because Mr. Lopez was not fully clothed, the officers asked Mr. Lopez where he was staying and where his clothes were. Tr. 53:1–8. One of the task force members then went and retrieved clothing for him. Tr. 53:24–54:2, 66:18–23. Mr. Lopez got fully dressed in the hallway, while still handcuffed, with the assistance of the officers. Tr. 83:15–84:11.

While that was happening, TFO Nunez, who speaks Spanish, entered the living room with Mr. Lopez's mother, Ms. Olmo. Tr. 160:20–23. Ms. Olmo—who later testified that she suffers from chronic obstructive pulmonary disease[11]—was using an oxygen tank connected to a very long tube that enabled her to move about the house. *Id.*

---

[10] At this point there is a gap in the video footage of approximately five seconds. When the footage resumes at 5:44:47, Deputy Marshal Mackey no longer appears on the porch. The other officers are seen standing, just before the threshold of the door. Another officer then steps onto the porch. Vid. 5:44:47–50.

[11] "[C]hronic obstructive pulmonary disease ("COPD") is defined as . . . a disease characterized by airflow limitation that is not fully reversible and is progressive and associated with an abnormal inflammatory response of the lungs to noxious particles or gases." *Adams v. U.S. Dep't of Labor*, 360 F. Supp. 3d 320, 325 n.6 (D.S.C. 2018) (citation and internal quotation marks omitted); *see also Alexander v. Astrue*, No. 09 C 3406, 2010 WL 3199356, at *1 n.5 (N.D. Ill. Aug. 10, 2010) ("Chronic obstructive pulmonary disease is defined as '[a]ny one of a group of diseases comprising emphysema, bronchial asthma, chronic bronchitis, bronchiectasis, and cystic fibrosis. It is marked by chronic obstruction of the bronchial tubes.'") (citation omitted).

TFO Nunez testified that he told Ms. Olmo to "remain calm" and began speaking with her. Tr. 160:24–161:1. They soon moved into the kitchen and sitting down at the kitchen table, primarily because it appeared to TFO Nunez that it was easier for her to use her oxygen there. Tr. 161:1–2, 162:12–20. TFO Nunez testified that Ms. Olmo was not upset, but "just wanted to know what was going on." Tr. 161:6–7. TFO Nunez testified that his goal, at that point, was to ensure that Ms. Olmo did not become upset enough to exacerbate her medical condition. Tr. 161:9–10. Shortly thereafter, Ms. Olmo asked for a glass of water, Mr. Soto got one for her, and Ms. Olmo took some medication. Tr. 161:11–16.

Shortly after Mr. Lopez was dressed, TFO Nunez began explaining to her, in Spanish, that the officers had executed an arrest warrant for her son. Ms. Olmo stated it was "unfortunate he's in trouble again" but otherwise remained calm. Ms. Olmo then told TFO Nunez that she was concerned that her landlord would find out about this situation and was afraid she would lose her housing. Tr. 163:21–164:2. According to TFO Nunez, she reiterated these concerns several times. *Id.*

TFO Nunez testified that Deputy Marshal Mackey then asked Ms. Olmo—through Mr. Nunez, who was translating—whether there was anything that wasn't safe in the home. Tr. 164:10–17. According to TFO Nunez, Ms. Olmo "clearly stated that you can search, you can check, that she did not want anything in her house that was illegal, that she wanted no problems, no issues, because clearly she didn't want to lose her housing." Tr. 164:17–21. Deputy Marshal Mackey testified that TFO Nunez then reported to him that Ms. Olmo had given verbal permission to search the premises. Tr. 56:2–3.

At that point, Deputy Marshal Mackey and other members of the task force escorted Mr. Lopez out of the house. Tr. 56:3–7. Mr. Lopez emerged from the house, accompanied by Deputy

Marshal Mackey and other officers, approximately five minutes after the officers had entered. Vid. 5:49:20–28.

While Mr. Lopez was being escorted down the porch steps, Deputy Marshal Mackey walked past him. Vid. 5:49:28–30. Deputy Marshal Mackey testified that at this point he went to his car to retrieve a consent to search form for Ms. Olmo to sign. Tr. 56:4–7. Deputy Marshal Mackey returned to the porch about one minute later, holding a folded piece of paper—which he testified was the consent to search form—and re-entered the home. Vid. 5:50:26–29; Tr. 56:3–7.

Once back inside, Deputy Marshal Mackey had TFO Nunez translate the form for Ms. Olmo. TFO Nunez testified that he and Deputy Marshal Mackey "went over the form" and "took our time with her and made sure that we -- that I translated the form for her." Tr. 165:7–9. He then described the translation process in greater detail:

> Q. Okay. And at the time that you were reviewing this, you said that you had translated it for Ms. Olmo. Can you describe how you translated it for her?
> A. She remained in the kitchen. She remained seated. I made sure that I was standing right by her with the form. I went over it with her line by line and I made sure that she understood, that I spelled her name correctly -- that her name was being spelled correctly. I made sure of the address that we were at, 174 East Ave, first floor. So I read everything to her and translated it.
> Q. Did she ask any questions about the form?
> A. She did not. Again, she didn't ask any questions regarding the form, no.
> Q. Did she ask any questions about any of the terms in the form?
> A. No.
> Q. Or did she ask what the form meant in terms of her that morning?
> A. No.
> Q. Did she indicate at any time that she didn't want to sign the form?
> A. No.
> Q. Did she ask any other questions of you regarding the form or the search of the apartment?
> A. No questions regarding the form, just wanted to reiterate that she wanted no issues, no problems, and she did not want to lose her housing. And she was concerned for her son. That's basically what she was referring to, but never referred to the form.

Q. And she communicated this to you in Spanish?

A. Yes.

Q. At the time that you were discussing the search, and including the time that she signed the form, did you or any other officers threaten her in any way to coerce her into signing the form?

A. No, absolutely not.

Q. Did she seem confused at any point in time about signing the form?

A. No.

Q. Was she ever handcuffed?

A. No.

Q. How about the other gentleman that was in the kitchen, was he ever handcuffed?

A. No.

Q. Were you armed that morning?

A. Was I armed? Yes.

Q. Was your gun holstered at the time?

A. Yes.

Q. How about anybody else that was in the kitchen, were their guns holstered?

A. Everyone was holstered.

Tr. 167:10–169:14.

According to Deputy Marshal Mackey, Ms. Olmo's demeanor during her interaction with

TFO Nunez was very relaxed:

Q. Deputy Mackey, did you observe Mr. Nunez interacting with -- I will refer to her as Lucila Olmo. You understood that's Mr. Lopez's mother?

A. Yes.

Q. Can you describe his demeanor and her demeanor as you observed it that morning?

A. It was very relaxed. They had an open dialogue back and forth. It was a conversation that kind of just flowed back and forth. They weren't --

Q. Did you ever observe anyone appear to raise their voice or yell at Ms. Olmo?

A. No.

Q. Did she herself -- did you observe her yell or raise her voice towards anyone?

A. No.

Q. What about her boyfriend, did you observe anyone yell or raise their voices towards him?

A. No.

> Q. And same question flipped, did you observe the boyfriend yell or
> raise his voice towards anyone?
> A. No.
> Q. Again, did you ever observe either of those individuals
> handcuffed?
> A. No, I did not.

Tr. 60:1–25.

After TFO Nunez translated the form, Ms. Olmo signed the form. Tr. 61:1–7; *see also*

Consent to Search Form, dated Oct. 12, 2017 ("Gov't Ex. 8."). The form was witnessed by TFO

Nunez and TFO Martin. *See id.*; Tr. 165:15–20, 148:22–149:13.

In her testimony,[12] Ms. Olmo described the officers' entry into the house, and her state of

physical and emotional well-being. According to Ms. Olmo, she was in a state of extreme

distress:

> Q. All right, please continue. What's the next thing you remember
> happening?
> A. Knocking the door down. They trying to break in. I started to
> suffer from my nerves. I got really very bad. My breathing started
> to cut back. I couldn't breathe. I asked him, "What's going on?" He
> says he doesn't know.
> Q. And the "him" was Albert?
> A. Yes.
> Q. And then --
> A. They were banging on the door so hard they broke the key off,
> and then the door got jammed. So my son told to hold it a second,
> he's not dressed, and he went to get some pants. And then he tried
> to
> reopen the door, but the door was jammed shut. And they keep
> banging from the other side very hard, and he said, "Hold it, hold
> it." Finally my son opened the door, he was able to open the door,
> and then immediately they grabbed him with the door right there,
> right by the door. He asked me for a shirt. And the policeman that
> was there,[13] he said, "No, I'll go get it."
>    I was in such bad shape I went into the kitchen to sit down
> and take some other medicine. Since then my pressure had gone up
> to 172 and I couldn't breathe properly.

---

[12] Ms. Olmo testified through a federally-certified, Spanish-language interpreter, Manuel Prado. Tr. 100:6–101:18.

[13] Later in her testimony, Ms. Olmo identified this officer as Deputy Marshal Mackey. Tr. 109:8–19.

So they all kept on coming in, coming into the room. After going through the room, I asked the policeman that's in the kitchen next to me if they had papers to do what they were doing. He said, "Yes." And I said, "Well, you haven't shown me anything." And then a while later he had a paper, a folded piece of paper that he gave to me for me to sign . . . .

Q. You said that you started to get distressed.

A. I thought I was going to die. I felt terrible.

Q. So you went and sat down in the kitchen?

A. I was shaking and I couldn't breathe. I never had something like that happen to me before, ever.

Q. And you took some more medicine, you said?

A. Yes.

Q. Was it the albuterol?

A. This, and another one for high blood pressure.

Q. When you take albuterol at home, what machine do you use?

A. The small little machine.

Q. Is it called a nebulizer?

A. Yes.

Q. And is that a separate machine from your oxygen?

A. Yes.

Q. So to take the medicine that morning while law enforcement was there, did you have to use your nebulizer?

A. When I started feeling badly. When I started feeling badly.

Q. Right. So that morning you are taking this extra medicine with this nebulizer, not with your oxygen tank?

A. No, when I use the nebulizer I continue using this. I can't stop using this. The nebulizer you take through the mouth.

Q. Is there a tube?

A. I put a little mouthpiece here.

Q. And does the mouthpiece connect to a different tube that connects to the machine?

A. Yes. There is a little tube, yes.

Q. You mentioned that you also took blood pressure medication?

A. Yes.

Q. Do you recall the name of that medication?

A. I forget the name. I have it at home. It's a small little white pill.

Q. Do you take that every day or just when you need it?

A. Every day. My daily medicine for the high blood pressure.

Q. The nebulizer treatment that you did, do you remember if you had needed to do that the day before or not?

A. I don't recall.

Q. When you were taking the nebulizer treatment, was there a police officer that was with you?

14

A. Yes. The policeman wanted to take me to the hospital. I said, "No, I'm going to take my medicine, that will calm me down." He wanted – he really wanted to take me to the hospital.

Q. Do you remember if the person who wanted to take you to the hospital was Deputy Mackey?

A. No, it was not him. No, no. No, it wasn't him.

Q. What did he look like?

A. Hispanic; not tall, shortish.

Q. When you interacted with the police officers, did you speak in English or in Spanish or both?

A. Spanish.

Q. Was there an officer who translated?

A. The policeman spoke Spanish.

Q. Was it just one person speaking Spanish or did more than one speak Spanish?

A. I don't recall. I was feeling very badly. I don't recall, but the one that spoke to me the most was the one that was next to me.

Q. And the one that was speaking to you in Spanish the most, is he the one who said we should take you to the hospital?

A. Yes, sir . . . .

Tr. 107:24–109:7; 110:3–113:5.

Ms. Olmo also offered a different account of the process of obtaining her consent to search. In her testimony, Ms. Olmo suggests that the written consent was never translated for her and that she never understood its contents whatsoever:

Q. The document that is in front of you on the screen, do you have any memory of that?

A. I don't recall. I remember the paper that the policeman gave me, it was full of words, full of words, and I signed on this side here, on this side here . . . .

Q. All right. So to help us understand, you remember a policeman giving you a document that you signed. And did that happen at the apartment when Albert was arrested?

A. After they took him out.

Q. After he had left the apartment?

A. Yeah, they took him out quickly.

Q. They took him out quickly, okay. So after he had been taken out, you signed something that you remember differently than this document?

A. Different than this one . . . .

Q. All right. So I want to just focus on the day when Albert was arrested. The document that you remember signing -- that you remember signing, do you remember signing it before or after you took the extra medication?

A. After the medicine.

Q. Do you remember police making any statement out loud about finding a gun?

A. No. No, they were -- I heard them going through the room searching the room, and then after that they brought me the paper for me to sign, and then afterwards the policeman was there and I asked him if they found something and the policeman nodded that they had . . . .

Q. Ms. Olmo, you recall signing a document. Do you remember them explaining to you what the document meant?

A. They said to me that it was so that they could search the room, but they had already been searching the room. And I told them I don't understand English and I can't read English, but I'll sign this if you need it.

Q. Did they explain to you that you could refuse to sign the document?

A. No.

Tr. 114:15–20, 114:23–115:8, 115:25–116:13, 121:19–122:4.

After Ms. Olmo signed the consent form, TFO King entered Mr. Lopez's bedroom to search and quickly located a firearm: a silver, .40 caliber pistol, the pistol. Tr. 61:6–11. Deputy Marshal Mackey then personally took several photographs of the room and the firearm as the officers discovered them. *See* Gov. Exs. 9 (showing photograph of open door of bedroom where gun was found); 10 (closer photograph of bedroom); 11 (coat rack close to where gun was found); 12 (box where gun was found); and 13 (close-up photograph of the pistol in the box near the clothes rack).

The pistol was seized by the officers at that time.

### B. Procedural History

 On November 1, 2017, a grand jury returned an indictment charging Mr. Lopez with one count of unlawful possession of a firearm by a felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Indictment at 1–2, ECF No. 1.

On February 6, 2018, Mr. Lopez moved to suppress the firearm, claiming that he had a reasonable expectation of privacy in the bedroom, and that the officers violated his Fourth Amendment right to be free from unreasonable searches and seizures by searching that room without a warrant or his consent. *See* Suppression Mot.

On February 20, 2018, the Government opposed the motion to suppress. Gov't Opp.

On April 9, 2018, the Court held an evidentiary hearing on the motion to suppress. Minute Entry, dated Apr. 9, 2018, ECF No. 25; Tr. 1–197. Six witnesses testified, and eighteen exhibits were admitted into evidence. *See id.* Because not all evidence could be heard that day, the Court continued the hearing to a future date. Tr. 191:2–192:22.

On June 26, 2018, the Court held the remainder of the hearing. Minute Entry, dated Jun. 26, 2018, ECF No. 35; Tr. 198–275. One additional witness testified, one was called for additional direct and cross-examination testimony, and one additional exhibit was admitted into evidence. *See id.*

On August 3, 2018, Mr. Lopez submitted his post-hearing brief. Def.'s Post-Hrg. Mem.

On August 24, 2018, the Government submitted its post-hearing brief. Gov't Post-Hrg. Mem.

On September 14, 2018, Mr. Lopez submitted a reply to the Government's post-hearing brief. Defendant's Post-Hearing Reply Memorandum, dated Sept. 14, 2018 ("Def.'s Post-Hrg. Reply"), ECF No. 48.

## II.    STANDARD OF REVIEW

Illegally obtained evidence is generally not admissible at a criminal trial under the exclusionary rule. *See, e.g., United States v. Scopo*, 19 F.3d 777, 781 (2d Cir. 1994) (citation omitted) (in the context of a Fourth Amendment violation); *United States v. Anderson*, 929 F.2d 96, 98–99, 102 (2d Cir. 1991) (in the context of the voluntariness of a confession under the Fifth Amendment); *see also Terry v. Ohio*, 392 U.S. 1, 12–13 (1968) (noting that the exclusionary rule maintains "judicial integrity" and "has been recognized as a principal mode of discouraging lawless police conduct") (citations omitted).

Exclusion of evidence is not automatic, however; it is considered a "last resort, not [a] first impulse." *Herring v. United States*, 555 U.S. 135, 140 (2009) (quoting *Hudson v. Mich.*, 547 U.S. 586, 591 (2006)); *see also id.* ("The fact that a Fourth Amendment violation occurred—i.e., that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies"). A court will suppress evidence only when the "remedial objectives" of the exclusionary rule "are thought most efficaciously served—that is, where its deterrence benefits outweigh its substantial social costs . . . ." *Hudson*, 547 U.S. at 591.

On "a motion to suppress physical evidence, the burden of proof is initially on the defendant." *United States v. Breckenridge*, 400 F. Supp. 2d 434, 437 (D. Conn. 2005). "Once the defendant has established some factual basis for the motion, the burden shifts to the government to show that the search was lawful." *Id.*; *see also United States v. Williams*, No. CR-06-0810 (CPS), 2007 WL 643051, at *3 (E.D.N.Y. Feb. 26, 2007) ("Having testified that he did not drop the bag of marijuana in view of the officers, the defendant has established a factual basis for his motion and shifted the burden to the government."); *United States v. Echevarria*, 692 F. Supp. 2d 322, 332 (S.D.N.Y. 2010) ("On a motion to suppress evidence in a criminal trial, once [the

defendant] has established a basis for his motion, the burden rests on the Government to prove, by a preponderance of the evidence, the legality of the actions of its officers.") (quoting *United States v. Wyche*, 307 F. Supp. 2d 453, 457 (E.D.N.Y. 2004), and collecting cases). "The standard of proof on the party who carries the burden is a preponderance of the evidence." *Breckenridge*, 400 F. Supp. 2d at 437 (citations omitted).

## III.  DISCUSSION

### A.  Standing to Move to Suppress

"Fourth Amendment rights are personal, and may be enforced only by persons whose *own* protection under the Amendment has been violated." *United States v. Fields*, 113 F.3d 313, 320 (2d Cir. 1997) (citing *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978)). "To contest the validity of a search, a defendant must demonstrate that he *himself* exhibited an actual subjective expectation of privacy in the area searched, and that this subjective expectation is one that society is willing to accept as reasonable." *Id.* (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979)). A defendant lacks standing to bring a motion to suppress if he or she does not establish a personally-held, reasonable expectation of privacy in the searched area. *See id.* ("A defendant lacks 'standing' in the Fourth Amendment context when his contacts with the searched premises are so attenuated that no expectation of privacy he has in those premises could ever be considered reasonable.").

The Supreme Court has recognized that an overnight guest may have a reasonable expectation of privacy in a host's home. *Minnesota v. Olson*, 495 U.S. 91, 98 (1990) ("To hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the everyday expectations of privacy that we all share. . . . [S]ociety recognizes that a houseguest has a legitimate expectation of privacy in his host's home.").

Here, Mr. Lopez was at least an overnight guest, if not a more regular visitor, at his mother's home. *See* Tr. 106:23–107:1 (stating that Mr. Lopez sometimes stayed at his mother's apartment to help her with her health issues).

Accordingly, the Court finds Mr. Lopez possessed a reasonable expectation of privacy, while he was staying overnight at his mother's home sufficient to give him standing to bring a motion to suppress. Mr. Lopez did not have to possess a property interest in the home, or have the "untrammeled power to admit and exclude" others from the property. *See Olson*, 495 U.S. at 99 ("[Guests] are entitled to a legitimate expectation of privacy despite the fact that they have no legal interest in the premises and do not have the legal authority to determine who may or may not enter the household. If the untrammeled power to admit and exclude were essential to Fourth Amendment protection, an adult daughter temporarily living in the home of her parents would have no legitimate expectation of privacy because her right to admit or exclude would be subject to her parents' veto.").

### B. Consent Requirement

The Government contends that Mr. Lopez's reasonable expectation of privacy is irrelevant because Ms. Olmo's consent was sufficient to allow the officers to search Mr. Lopez's bedroom; thus, Mr. Lopez's express consent to the search was not required.

The Court agrees.

As the sole tenant, Ms. Olmo had actual authority to consent to the search of all parts of the home, including the bedroom in which Mr. Lopez was staying.

Mr. Lopez argues that, by keeping him away from Ms. Olmo when her consent to search was sought, Mr. Lopez was "precluded" from objecting to the search.[14] Def.'s Post-Hrg. Mem. at

---

[14] The Court notes that there is no evidence that Mr. Lopez, while handcuffed and standing in the hallway, voiced any objection to a potential search of the premises.

13. Had he not been so precluded, Mr. Lopez argues that he would have objected to the search, which would have prevented the search from proceeding under the rule of *Georgia v. Randolph*, 547 U.S. 103 (2006). *Id.* at 14.

Even if Mr. Lopez had the rights of a co-tenant, the Second Circuit has held—in a case also involving Mr. Lopez—that a co-tenant, such as Ms. Olmo, could still give valid consent to a search of the apartment, and that the officers are "under no affirmative obligation to request consent form a potentially objecting co-occupant before acting on permission they received from another occupant." *United States v. Lopez* (*Lopez I*), 547 F.3d 397, 400 (2d Cir. 2008) (citing *Randolph*, 547 U.S. at 122).

In that case, after the police entered and executed an arrest warrant for Mr. Lopez, Mr. Lopez remained on the lower level of the residence, while officers went upstairs with a girlfriend/co-occupant to retrieve clothes for him. *Lopez I*, 547 F.3d at 398. Once the officer and girlfriend arrived at the upstairs bedroom, the officer requested consent to search, which the girlfriend voluntarily gave. *Id.* Mr. Lopez, "after being arrested, remained inside the house during the entire search." *Id.* at 400. There was also no evidence that "the marshals removed Lopez for the purpose of avoiding his potential objection," or that they "separated Lopez from his girlfriend in order to conceal from him that they would ask her for consent." *Id.* In light of these facts, the Second Circuit found Mr. Lopez's girlfriend's consent valid because the officers "had no duty to ask Lopez whether he consented to the search, no matter how easy or convenient it might have been to do so." *Id.* "Rather, the onus was on Lopez to object to the search. Because he did not object, his girlfriend's consent was valid, and the search was reasonable." *Id.*

Here, Ms. Olmo gave her verbal consent to search, while Mr. Lopez was still in the apartment, as did his girlfriend in *Lopez I*. And, as in *Lopez I*, he did not object. Then, after he was removed from the apartment, she reaffirmed her consent on a written form.

Even if Mr. Lopez was too far to hear Ms. Olmo give this consent—and nothing about the record suggests he was out of earshot—the "onus was on Lopez to object to the search." *Lopez I*, 547 F.3d at 400. The officers had no obligation to come into the hallway and ask his permission to search. By failing to object, Mr. Lopez cannot now invoke the *Randolph* objecting co-tenant exception.

But Mr. Lopez has not demonstrated that he had rights equivalent to that of a co-tenant.[15] He has shown, at most, that he had the rights of a mere overnight guest. It therefore does not matter whether Mr. Lopez was "precluded" from objecting at all.

In *Randolph*, the Supreme Court only recognized that if a co-tenant, occupant, or resident consents to a warrantless search, and another co-tenant, occupant, or resident who is present objects to the search, "the co-tenant's permission does not suffice for a reasonable search." *Randolph*, 547 U.S. at 121. Mr. Lopez's argument that the narrow exception in *Randolph* for an objecting co-tenant confers the same rights on an overnight guest conflates Mr. Lopez's reasonable expectation of privacy as an overnight guest—which simply establishes his threshold standing to move to suppress the fruits of the search—with the full property and privacy interest available to a co-tenant, occupant, or resident.

---

[15] The weight of the evidence strongly indicates that Mr. Lopez had not become a co-tenant, occupant, or resident of Ms. Olmo's home. First, Mr. Lopez was required to notify his probation officer, if his residence changed, but did not do so—suggesting his residence was still located at Maplewood Avenue. Second, Ms. Olmo testified that Mr. Lopez only stayed with her sometimes out of concern for her health and to help her out, and that she knew that under the terms of her lease other individuals were not allowed to live with her. *See* Tr. 106:23–107:8. Tr. 132:8–133:3.

Put another way, a mere overnight guest's objection to a search does not override the consent of a tenant, occupant, or resident with a possessory interest in the property. *See Fernandez v. California*, 571 U.S. 292, 298 (2014) ("It would be unreasonable—indeed, absurd—to require police officers to obtain a warrant when the sole owner or occupant of a house or apartment voluntarily consents to a search. The owner of a home has a right to allow others to enter and examine the premises, and there is no reason why the owner should not be permitted to extend this same privilege to police officers if that is the owner's choice."); *Olson*, 495 U.S. at 99 ("That the guest has a host who has ultimate control of the house is not inconsistent with the guest having a legitimate expectation of privacy. The houseguest is there with the permission of his host, who is willing to share his house and his privacy with his guest. It is unlikely that the guest will be confined to a restricted area of the house; and when the host is away or asleep, the guest will have a measure of control over the premises. The host may admit or exclude from the house as he prefers . . . . The point is that hosts will more likely than not respect the privacy interests of their guests, who are entitled to a legitimate expectation of privacy despite the fact that they have no legal interest in the premises and do not have the legal authority to determine who may or may not enter the household."); *United States v. Snype*, 441 F.3d 119, 136 (2d Cir. 2006) ("The law in this circuit is well settled that a third party's consent will validate a search of places or items in which another maintains a privacy interest if two conditions are satisfied: the third party had (1) access to the area searched, and (2) either (a) common authority over the area; or (b) a substantial interest in the area; or (c) permission to gain access [to the area].") (citation and internal quotation marks omitted).

### C. Voluntariness of Ms. Olmo's Consent

"[A] search pursuant to consent may result in considerably less inconvenience for the subject of the search, and, properly conducted, is a constitutionally permissible and wholly legitimate aspect of effective police activity. But the Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force." *Schneckloth v. Bustamante*, 412 U.S. 218, 228 (1973).

When the "government relies on consent to justify a warrantless search, it bears the burden of proving by a preponderance of the evidence that the consent was voluntary." *Snype*, 441 F.3d at 131; *United States v. Calvente*, 722 F.3d 1019, 1023 ("The government has the burden of proving consent voluntarily given by a preponderance of the evidence, in light of the totality of the surrounding circumstances.") (citations and internal quotation marks omitted); *Bumper v. North Carolina*, 391 U.S. 543, 549 (1968) ("When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given.").

"[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227. "To ascertain whether consent is valid, courts examine the totality of all the circumstances to determine whether the consent was a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995) (citations and internal quotation marks omitted).

Mr. Lopez argues that Ms. Olmo's consent was not voluntary. *See* Def.'s Post-Hrg. Mem. at 21 ("The government wants the Court to believe that this monolingual senior citizen, awoken

before dawn by a police raid, coolly and calmly decided to consent to a search without any express or implied threats, yet admits that the only concern she expressed was whether her housing benefits were going to be cut off. The excerpt above is not a portrait of a woman just doing her civic duty to help police. If accurate and truthful, it is a portrait of a woman who is intimidated, confused, and who will do anything, sign anything, or allow anything to avoid the personal catastrophe that would be eviction from her modest home. There is simply no way that she can be said to have consented to the search intelligently, willingly, and freely.").

The Court disagrees.

The Court has found, after weighing the testimony and assessing all of the witnesses' credibility, that Ms. Olmo's consent was voluntary. Indeed, the evidence belies the notion that the law enforcement officials on the scene sought to take advantage of her health or her limited English proficiency to secure the consent to search her home.

First, Ms. Olmo's own testimony suggests that the law enforcement officials did not seek to obtain her consent to search by leveraging her precarious health status. As she testified: "The policeman wanted to take me to the hospital. I said, 'No, I'm going to take my medicine, that will calm me down.'" Tr. 112:7–9. She followed up by noting that "he really wanted to take me to the hospital." Tr. 112:9–10. As a result, Ms. Olmo has conceded that nothing further would have occurred with her at her home, if she wanted to go to the hospital. In other words, if Ms. Olmo was not calm enough to proceed, she could have and presumably would have gone to the hospital or sought medical treatment of some form, particularly since the law enforcement officials were willing to make sure she received it, based on her own testimony.

Second, at all times, law enforcement officials on the scene communicated with Ms. Olmo in her native language, Spanish. Again, as she testified, she spoke with the police officers

in Spanish and the police officer who spoke with her also spoke Spanish. Tr. 112:17–22

("Q: When you interacted with the police officers, did you speak in English or in Spanish or in both? A: Spanish. Q: Was there an officer who translated? A: The policeman spoke Spanish."). Thus, there is no evidence that the law enforcement officials sought to take advantage of her limited English proficiency and deceive her into providing her consent to search her home.

But even if the Court were to accept Ms. Olmo's testimony that she was in a state of great physical distress during and after the arrest, that testimony would not establish that Ms. Olmo's consent was coerced.

Here, Ms. Olmo gave her verbal consent to the search, in Spanish. Once that consent was relayed, the officers did not immediately begin searching—even though such a search would have been permissible. Instead, they took the time—after removing Mr. Lopez—to obtain her written consent as well.

Ms. Olmo then re-affirmed her consent by signing the form—after it was explained to her in Spanish, while sitting at her kitchen table. *See, e.g.*, Tr. 68:23–69:23 (Deputy Marshal Mackey describing scene in kitchen when Ms. Olmo provided both verbal and written consent); Tr. 146:25–147:24 (TFO Martin stating that nothing about Ms. Olmo's physical appearance indicated that she was having trouble, and explaining that a conversation, some in English and some in Spanish, occurred before Ms. Olmo gave consent to search); Tr. 164:10–24 (TFO Nunez testifying that he and Deputy Marshal Mackey asked Ms. Olmo whether "there was anything that wasn't safe in the home, if there was anything of her knowledge in the home, and she clearly stated that you can search, you can check, that she did not want anything in her house that was illegal, that she wanted no problems, no issues, because clearly she didn't want to lose her housing.").

There are, simply put, no circumstances here which indicate that Ms. Olmo's consent was improperly coerced in any way. *Cf. United States v. Mapp*, 476 F.2d 67, 77–78 (2d Cir. 1973) ("Mrs. Walters was undeniably in custody when Patrolman Crowe entered her bedroom, with gun in hand, and announced to her that she was under arrest. Then, without advising her of her rights, and without taking even minimal steps to establish an atmosphere of relative calm somewhat more conducive to the making of a knowing and intelligent decision, he stated, "We want the package that Sonny left earlier.' Although the district judge, in ruling on the motion to suppress, believed the latter expression amounted only to a statement, and not a question, and that Mrs. Walters's response constituted a voluntary act of consent to the search, we cannot accept this view of the facts. We conclude that the statement here in question was an outright demand–without ifs, ands or buts–and the voluntariness of the 'consent' that followed must be measured in light of that demand.").

Instead, the Court finds that "numerous steps were taken that did restore calm" to Ms. Olmo's home "before she consented to any search." *Snype*, 441 F.3d at 131. Accordingly, the Court concludes that the Government has met its burden and shown, by a preponderance of the evidence, that Ms. Olmo's consent was voluntarily given, both when she gave verbal consent as well as written consent, and that the search of the bedroom was constitutionally permissible.

## IV. CONCLUSION

For all of the reasons explained above, Defendant's motion to suppress is **DENIED**.

**SO ORDERED** at Bridgeport, Connecticut, this 13th day of August, 2019.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE